UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE BERARDI, | Case No. 13cv1598-BTM (BLM) |
| Petitioner, | **REPORT AND RECOMMENDATION FOR ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| DANIEL PARAMO, | |
| Respondent. | [ECF No. 6] |

This Report and Recommendation is submitted to United States District Judge Barry T. Moskowitz pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On July 9, 2013, Petitioner George Berardi, a state prisoner, commenced these habeas corpus proceedings pursuant to 28. U.S.C. § 2254.  ECF No. 1. ("Pet.").  On July 15, 2013, Petitioner filed a First Amended Petition ("FAP").  ECF No. 6.  Petitioner challenges his conviction of one count of conspiracy to commit murder and one count of first degree murder with a firearm allegation.  Id. at 2.  Respondent filed an answer on March 7, 2014 [ECF No. 21-1] and Petitioner filed a traverse on June 9, 2014 [ECF No. 28] and a supplemental traverse on July 4, 2014 [ECF No. 29].

This Court has considered the Petition, Answer, Traverse, Supplemental Traverse, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in <u>People v. Berardi</u>, Appeal No. D056544, slip op. (Cal. Ct. of App. Jan 12, 2012).  Lodgment 12.  This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

A. The Kegler–Winchell–Berardi Love Triangle

The victim, Marcus Kegler, met Desiree Winchell when they were in junior high school together, and they became good friends. However, in 2000 Kegler left California and moved to Mississippi.

After Kegler left California, Winchell became romantically involved with Berardi. By 2004, Winchell and Berardi had begun living together. May, who was Berardi's best friend, lived in the same house with Winchell and Berardi.

By the end of 2004 or the beginning of 2005, the Winchell–Berardi relationship had deteriorated, and they fought frequently. In January 2005, Winchell decided to end their relationship and told Berardi of her decision. Berardi asked her to give him until July to show the relationship could work, and she agreed, but the arguing persisted.

In January 2005 Winchell received an unexpected phone call from Kegler and they resumed their friendship. Berardi was aware of their communications and these contacts became another source of conflict between Berardi and Winchell.

At the end of April 2005, Winchell moved out of the house she was sharing with Berardi. As Winchell was moving out, Berardi tried to stop her. He smashed her cell phone on the ground, physically pinned her down, and told her she was not going to leave. Winchell nevertheless moved out and began living with her mother.

Around the time she began living with her mother, Winchell also purchased an airline ticket for Kegler to visit her in San Diego. Kegler arrived in early May 2005 to visit. Although Kegler initially planned to stay for only a week, he decided to stay indefinitely in San Diego and moved into his uncle's home on Castle Glen Drive in San Diego. Winchell and Kegler began a romantic relationship, and he stayed on occasion with Winchell in her apartment.

When Winchell left Berardi, she took some possessions belonging to him and Berardi later went to Winchell's apartment to collect them. Kegler was present when Berardi arrived. Berardi became angry, said Kegler should not be there, and sped away. Berardi called a few minutes later and argued with Winchell on the telephone. Kegler took the phone from Winchell and argued with Berardi, and the two men threatened each other.FN2

FN2. After Kegler arrived in San Diego and his relationship with Winchell deepened,

Berardi threatened to kill him on more than one occasion.

At the end of May 2005, Berardi went to Los Angeles accompanied by Winchell. While in Los Angeles, Berardi tried to convince her to marry him, but she refused. After a short stay in Los Angeles, Berardi returned to San Diego in late June or early July 2005. Berardi (along with May) began staying at the apartment of Nathaniel Green (a friend of Berardi) and Anna Tong (Green's girlfriend). The apartment was approximately one block east of Castle Glen Drive.

B. The Murder

In the early evening of July 8, 2005, Kegler was shot in a cul-de-sac near his uncle's home. He later died from this injury. The shooting site was near Green's apartment. The events of the day leading up to the shooting formed a significant aspect for the prosecution's case against Berardi and May.

Kegler's Planned Meeting With Berardi

Kegler and Winchell were scheduled to go to Ms. Wiggins's home on the evening Kegler was killed. Earlier during that day, Kegler called Wiggins to tell her he was trying to buy some marijuana to bring with him to Wiggins's home. He told Wiggins he was planning to meet with Berardi around 3:00 p.m. that afternoon to acquire the marijuana. Wiggins expressed concerns to Kegler about dealing with Berardi because Berardi was unhappy about Kegler's relationship with Winchell.

In the two hours before the scheduled meeting between Berardi and Kegler, Berardi's cell phone records showed repeated calls from Berardi's cell phone to Green (the apparent source for the marijuana) but Green did not answer. FN3 The records also showed several phone calls from Kegler to Berardi during that afternoon. The planned mid-afternoon rendezvous between Berardi and Kegler did not occur because Berardi was unable to obtain the marijuana for Kegler

FN3. Berardi had spoken to Green about getting a quantity of marijuana to sell to Kegler, but Green was reluctant to help because he had heard Kegler had threatened Berardi.

However, when Kegler left work around 4:00 p.m., a coworker (Mr. Zanina) gave him a ride to Kegler's residence on Castle Glen Drive. On the way, Kegler told Zanina he planned to buy some marijuana later that day from his girlfriend's ex-boyfriend. After Kegler got home, phone records showed several more calls were placed between Kegler and Berardi between 4:00 and 6:00 p.m.

Berardi Establishes His Alibi

Around 5:30 p.m., Winchell arrived at Kegler's apartment. Kegler told Winchell he was almost ready to leave for Wiggins's residence, and Winchell phoned Wiggins at 5:35 p.m. and left a message for Wiggins that they would be leaving soon. However, at 5:41 p.m., Berardi phoned Kegler, and at 5:51 p.m., Kegler returned Berardi's telephone call. Ms. Tong, who was with Berardi when he received the latter phone call,FN4 overheard Berardi mention a quarter pound of marijuana, a price, and the cul-de-sac, and Berardi told Kegler they would meet immediately and that Berardi would be at the meeting.FN5

FN4. Tong and Berardi were en route to a pizza restaurant together when the 5:51 p.m. call came. Tong testified the genesis of their trip to the restaurant began when she was at her apartment with May, Berardi, Green and another man. Berardi asked Tong to accompany him to a restaurant for beer and breadsticks, and Tong thought the invitation was unusual because she and Berardi had typically gone out together with other friends. However, she accepted Berardi's invitation and they left the apartment around 5:45 p.m.

FN5. When interviewed by a defense investigator in 2008, Tong allegedly told the investigator that Berardi did not tell Kegler that he would meet Kegler to do the transaction, but instead told him that Kegler "would be met on the cul[-]de[-]sac."

Berardi did not go to the meeting with Kegler. Instead, after stopping briefly at a 7–Eleven Store, Berardi and Tong went to the restaurant. While there, Berardi told Tong that May was going to shoot Kegler because Berardi wanted Kegler dead, and that Berardi planned to keep the receipts from their visits to the 7–Eleven Store and the restaurant for his alibi, and that Tong (as well as a friend of Berardi's who worked at the restaurant) would verify his alibi. While still at the restaurant, Berardi received a call from May, and Tong overheard May report that the "pizza has been delivered." Berardi decided they could leave because the "coast was clear" and told Tong that, if anyone asked, Tong should tell them that Berardi had been with her at the 7–Eleven Store and the restaurant.

May Meets With and Shoots Kegler

Meanwhile, Kegler (apparently in response to his last phone conversation with Berardi) woke Winchell up around 6:15 p.m. and told her he was leaving the Castle Glen Drive apartment but would be right back. He did not say where he was going or what he needed to do, and Winchell fell back asleep.

At Green's apartment, after Berardi and Tong left for the restaurant, May asked Green to supply him with a quarter pound of marijuana that May was to sell to someone. Green did not know the identity of May's customer. May took the marijuana and left to meet with Kegler. He returned about 15 to 20 minutes later, and Green overheard May speaking on the phone and saying something about "the pizza." Mr. Cameron testified he was at the apartment when May left with the marijuana and that, when he returned, May was calm.FN6

FN6. A defense investigator testified she interviewed Cameron in 2008 and that Cameron told the investigator May was distraught when he returned, and that Berardi seemed shocked when he learned Kegler had been killed. The investigator also interviewed Tong, who told her that May was fearful of Kegler and felt threatened when he shot him.

At 6:17 p.m., a local resident discovered Kegler lying on the ground and called 911. Police and paramedics arrived, and Kegler was taken to a hospital, where he later died from a gunshot wound to the head.

C. The Investigation and Subsequent Events

After police arrived and questioned Winchell, they went to Green's apartment and separately questioned Tong and Berardi. Tong did not reveal the events at that time because she did not want to get involved. Police did not arrest Berardi because he denied any knowledge of the shooting and his proffered alibi was corroborated by Tong. After police left, Tong went to her room to shower. She

found May hiding in a closet, and May later told Tong that he had shot Kegler at close range in the head.

May decided to leave town because he was scared. Surveillance tapes from the Greyhound Bus depot in San Diego showed May was at the ticket counter at 12:45 a.m. on July 9 purchasing a ticket for Las Vegas and showed May in line to board the bus at 6:26 a.m. that morning.

Berardi subsequently told police May was in Las Vegas, and Las Vegas authorities arrested May at the request of San Diego police. Detective Young interviewed May on August 26, 2005, but later released him. However, on August 31, 2005, Detective Young again interviewed May by phone, and during this interview, May confessed to shooting Kegler. May claimed that he went to sell marijuana to Kegler and, after giving it to him, May "freaked out" when Kegler reached into his pocket. May claimed he thought Kegler was reaching for a gun, and reacted by shooting Kegler. When Young informed him that no gun had been found, May began to cry and ended the phone call.

In September 2005, when May was in custody in San Diego, he agreed to do a video reenactment of the shooting, and the video reenactment was played for the jury. The jury also viewed a videotape, taken by a security camera from a nearby business, which was running during the shooting.

D. Defense Evidence

The defense attacked Tong's credibility through several avenues. First, the defense relied on her admissions that she did not tell police about her conversation with Berardi at the restaurant FN7 or about May's involvement when she was initially interviewed, and did not tell police about the conversation until many months later, and that she asked for immunity from any possible charges arising from the events. Second, the defense called Lucas Irwin, Tong's former husband, who testified she lied about him in court during a prior custody dispute and that she was a vindictive person. Third, the defense showed Tong bore animosity towards Berardi and was willing to do anything, including lie, to get Berardi out of Green's life.

FN7. The defense also called Mr. Ahmu, Berardi's friend who worked at the restaurant that night. Ahmu testified neither Berardi nor Tong seemed to be under any stress and that Tong left the restaurant smiling. The time stamp on the receipt from the restaurant, which was off by about 40 minutes, indicated they paid for their food at about 6:24 p.m.

The defense also introduced the testimony of Mr. and Mrs. Burkheart, May's employers in Las Vegas, who testified he was an honest, nonviolent person. Mrs. Burkheart also testified she was present when May had the telephone interview with a San Diego detective concerning the shooting. Mrs. Burkheart testified that, after May hung up, he was distraught because the detective told May that Kegler had been unarmed and May said he thought Kegler had a gun.

Lodgment 12 at 2-9.

On November 21, 2008, the People of the State of California filed a second amended information charging Petitioner with murder and conspiracy to commit murder.  Lodgment 1 at

1    338-341.  Following a trial, the jury found Petitioner guilty of first degree murder and conspiracy

2    to commit murder.  Id. at 1042.  The jury also found true an allegation that "at the time of the

3    commission and attempted commission of the above offense, [Petitioner] was vicariously armed

4    with a firearm, to wit a handgun, within the meaning of Penal Code section 12022(a)(1)."  Id.

5    at 341, 1042.  On December 29, 2009, the trial judge sentenced Petitioner to an indeterminate

6    term of twenty-five years to life.  Id. at 1041-1042.

7        On November 16, 2010, Petitioner appealed his conviction, arguing that the trial court

8    abused its discretion by denying his motion for a new trial due to juror bias and joining all of the

9    arguments raised by Daniel May, his co-defendant and co-appellant.[1]  Lodgment 7.  On January

10   12, 2012, the court of appeal published a written opinion affirming the judgment of the trial

11   court.  Lodgment 12.  On February 24, 2012, Petitioner filed a petition for review in the Supreme

12   Court of California, raising the sole claim that the "trial court abused its discretion by denying

13   Petitioner's motion for a new trial based on juror bias," which was denied on April 11, 2012.

14   Lodgment 13.[2]

15       On July 10, 2013[3], Petitioner filed a petition for writ of habeas corpus in the California

16   Supreme Court arguing that his appellate counsel was ineffective for failing to brief the issue of

17   Petitioner's trial counsel's refusal to allow Petitioner to testify.  Lodgment 13.  Petitioner also

18

19   _____

20   [1]Daniel May argued that (1) his request for a new trial should have been granted because the actual bias of
     juror number nine prevented him from receiving a fair trial, (2) the trial court's response to juror note one prejudicially
21   misdirected the jury by precluding it from convicting on the conspiracy charge if it found Mr. May guilty of second
     degree murder, (3) the trial court erred when it failed to instruct the jury that it could not convict Mr. May of
22   conspiracy based on Petitioner's statements unless the corpus delicti of that crime was shown by independent
     evidence, (4) CALCRIM NO. 418, as given, erroneously allowed the jury to use Petitioner's statements to Tong against
23   Mr. May if it found a conspiracy to sell marijuana to the victim, and (5) the cumulative impact of the instructional
     errors deprived Mr. May of his Fourteenth Amendment due process right to a fundamentally fair trial.  Mr. May also
     joined Petitioner's arguments.  Lodgment 8.
24
     [2]There are three documents labeled LODGMENT 13 in the record.  Petitioner's petition for review, the California
25   Supreme Court Order denying the petition for review, and Petitioner's petition for writ of habeas corpus which also
     was filed in the California Supreme Court.
26
     [3]The first page of the lodged petition is too dark to read the file date stamp and Petitioner's counsel signed
27   the petition on July 3, 2013, but in his motion to stay [ECF No. 4], Petitioner's counsel states that it was filed on July
     10, 2013 and that the delay between his signature and the filing dates was probably due to delays at the San
28   Francisco airport.  Lodgment 13 at 38; ECF No. 4 at 4.

argued that the trial judge used the wrong standard to assess prejudice based upon the denial of his right to testify. Id. The California Supreme Court denied the petition without comment or citation of authority on January 21, 2014. ECF No. 19-1 at 1.

Petitioner began federal habeas proceedings on July 9, 2013, when he filed his Petition for Writ of Habeas Corpus. Pet. Petitioner filed the currently-operative FAP on July 15, 2013. FAP. In his FAP, Petitioner alleges that his constitutional rights were violated when he did not receive a new trial due to actual juror bias and when he received ineffective assistance of counsel from his appellate attorney who failed to brief the issue of Petitioner's trial attorney's "refusal to allow Petitioner to testify and the use of [sic] the trial judge of the wrong standard to assess prejudice." FAP at 9, 22. On July 12, 2013, Petitioner filed a motion to stay asking the Court to hold his FAP in abeyance while he exhausted his ineffective assistance of counsel claim in the California Supreme Court. ECF No. 4. On September 18, 2013, the Court issued a Report and Recommendation recommending that Petitioner's motion to stay be granted in part and denied in part. ECF No. 13. On January 21, 2014, Petitioner filed a notice informing the Court that Petitioner's California Supreme Court petition was denied, rendering all of his claims exhausted. ECF No. 19. On February 14, 2014, Judge Moskowitz filed an order declining to adopt the Report and Recommendation on the motion to stay and denying the motion to stay since the state court remedies were exhausted and the motion was moot. ECF No. 20. Judge Moskowitz ordered Respondent to respond to the FAP on or before March 17, 2014 and stated that Petitioner could file an opposition or traverse on or before March 31, 2014. Id. Respondent filed an answer on March 7, 2014 and Petitioner filed a traverse on June 9, 2014 and a supplemental traverse on July 4, 2014. ECF Nos. 21, 28 and 29.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

1  28 U.S.C. § 2254(a) (West 2012).

2      The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty

3  Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C.

4  § 2254(d), as amended by AEDPA:

5          (d) An application for a writ of habeas corpus on behalf of a person in
   custody pursuant to the judgment of a State court shall not be granted with
6  respect to any claim that was adjudicated on the merits in State court proceedings
   unless the adjudication of the claim—

7          (1) resulted in a decision that was contrary to, or involved an unreasonable
8  application of, clearly established Federal law, as determined by the Supreme Court
   of the United States; or

9          (2) resulted in a decision that was based on an unreasonable determination
10  of the facts in light of the evidence presented in the State court proceeding.

11  28 U.S.C. § 2254(d) (West 2012).  In making this determination, a court may consider a lower

12  court's analysis.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court

13  to look through to the last reasoned state court decision).  Summary denials are presumed to

14  constitute adjudications on the merits unless "there is reason to think some other explanation

15  for the state court's decision is more likely."  Harrington v. Richter, 131 S.Ct. 770, 784-785

16  (2011).

17      A state court's decision is "contrary to" clearly established federal law if the state court:

18  (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2)

19  "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

20  Court and nevertheless arrives at a result different from [Supreme Court] precedent."  Williams

21  v. Taylor, 529 U.S. 362, 405-06 (2000).

22      A state court's decision is an "unreasonable application" of clearly established federal law

23  where the state court "'identifies the correct governing legal principle from [the Supreme] Court's

24  decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  Lockyer

25  v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).  "[A] federal habeas

26  court may not issue [a] writ simply because that court concludes in its independent judgment

27  that the relevant state-court decision applied clearly established federal law erroneously or

28  incorrectly.  Rather, that application must be objectively unreasonable."  Id. at 75-76 (emphasis

8                                                    13cv1598-BTM (BLM)

added) (citations and internal quotation marks omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 131 S.Ct. at 786.  In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (1996); Wood v. Allen, 130 S.Ct. 841, 845 (2010).  A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable).  This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007).

## DISCUSSION

Petitioner raises two grounds for relief in his FAP.  First, he contends that he was denied his constitutional right to a fair trial due to the actual bias of Juror No. 9.  FAP at 9-22.  Second, Petitioner alleges that his appellate counsel provided constitutionally ineffective assistance of counsel when he failed to brief the issue that trial counsel prevented Petitioner from testifying at trial.  Id. at 22-35.  Respondent contends that the trial court's denial of Petitioner's motion for a new trial due to juror bias was in accord with clearly established federal law and that the

1  court's rejection of Petitioner's ineffective assistance of counsel claim was reasonable.  ECF No.

2  21-1.  Respondent also argues that Petitioner's ineffective assistance of appellate counsel claim

3  is untimely.  Id. at 21-25.

4  **A.      Right to an Impartial and Unbiased Jury**

5         Petitioner argues that the actual bias of Juror No. 9 prevented Petitioner from receiving

6  a fair trial and that the trial judge erred when he denied Petitioner's motion for a new trial.  FAP

7  at 9-22.  Petitioner asserts that after the verdict was reached, it was revealed that during the

8  deliberations, Juror No. 9, the only African-American on the jury, stated words to the effect that

9  "if it had been a white boy on the ground and a black boy who had done the shooting...that it

10  wouldn't have taken us five minutes to reach the verdict."  Id. at 12.  When a juror protested,

11  Juror No. 9 responded "[i]f the shoe fits wear it."  Id.  Petitioner also claims that Juror No. 9 was

12  seen conversing with the parents of the victim, who also was African-American.  Id. at 13.

13  Petitioner argues that Juror No. 9's statements established that he had actual racial bias against

14  Petitioner in violation of Petitioner's Sixth Amendment rights.  Id. at 10-17.  Petitioner also

15  alleges that the state court's decision in this case was an unreasonable determination of the facts

16  as the record shows that Juror No. 9 was biased and intimidated multiple jurors to change their

17  opinion as to Petitioner's guilt.  Id. at 13-17.  Petitioner further alleges that the state court's

18  decision was an unreasonable application of clearly established federal law as Juror No. 9 created

19  a "destructive uncertainty" about the indifference of other jurors.  Id. at 17-21.  Finally, Petitioner

20  contends that this error was not harmless and had a substantial and injurious effect on the jury's

21  verdict.  Id. at 21.  Petitioner also asserts that the error is a structural error, requiring that his

22  Petition be granted and his conviction reversed.  ECF No. 29.  Respondent responds that the trial

23  court's denial of Petitioner's motion for a new trial was in accord with clearly established federal

24  law.  ECF No. 15.

25         Petitioner presented his first claim to the state supreme court in a petition for review.

26  Lodgment 13.  The petition for review was summarily denied without a statement of reasoning

27  or citation of authority.  Lodgment 13.  Petitioner presented this claim to the appellate court in

28  the same manner as it was presented to the state supreme court.   Lodgment 7.  The appellate

court denied the claim in a reasoned opinion.   Lodgment 12.   The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion.   Ylst, 501 U.S. at 804.   In denying the appeal, the appellate court stated the following:

A. Legal Framework

Substantive Rights

An accused has a constitutional right to a trial by an impartial jury. (In re Hitchings (1993) 6 Cal.4th 97, 110.) "An impartial jury is one in which no member has been improperly influenced [citations] and every member is " 'capable and willing to decide the case solely on the evidence before it." ' " (In re Hamilton (1999) 20 Cal.4th 273, 294.)

Because a defendant charged with a crime is "entitled to be tried by 12, not 11, impartial and unprejudiced jurors" (People v.. Holloway (1990) 50 Cal.3d 1098, 1112, disapproved on other grounds by People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1), the law is "clear that even one biased juror requires overturning the verdict." (In re Carpenter (1995) 9 Cal.4th 634, 652.) However, "before a unanimous verdict is set aside, the likelihood of bias ... must be substantial. As indicated in the high court decisions discussed above, the criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." (Id. at pp. 654–655.)

As explained by the court in People v. Nesler (1997) 16 Cal.4th 561, 580–581:

"What constitutes 'actual bias' of a juror varies according to the circumstances of the case. [Citation.] In assessing whether a juror is 'impartial' for federal constitutional purposes, the United States Supreme Court has stated: 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' ( United States v. Wood (1936) 299 U.S. 123, 145–146....) " 'The theory of the law is that a juror who has formed an opinion cannot be impartial." [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved.... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' [Quoting Irvin v. Dowd (1961) 366 U.S. 717, 722–723, italics added by Nesler.] " '[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but ... those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him." ' [Quoting Reynolds v. United States (1878) 98 U.S. 145, 155.] An impartial juror is someone 'capable and willing to decide the case solely on the

evidence' presented at trial."

Procedural Framework

When a defendant discovers posttrial that a juror was guilty of misconduct as a result of " 'an actual [bias]' … [which] in this context is defined as 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party,' " the defendant may move for a new trial. (<u>People v. Nesler</u>, <u>supra</u>, 16 Cal.4th at p. 581.) The trial court is vested with broad discretion when ruling on a motion for new trial based on alleged jury misconduct (<u>People v. Dykes</u> (2009) 46 Cal.4th 731, 809) and, "[w]hen a defendant moves for a new trial based on jury misconduct, the trial court undertakes a three-part inquiry. 'First, the court must determine whether the evidence presented for its consideration is admissible…. [¶] Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct…. [¶] Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial.' (<u>People v. Duran</u> (1996) 50 Cal.App.4th 103, 112–113.) In making the determination as to the admissibility of the evidence presented, including declarations of jurors, '… the trial court must take great care not to overstep the boundaries established by Evidence Code section 1150.' ( Id. at p. 112.)" (<u>People v. Sanchez</u> (1998) 62 Cal.App.4th 460, 475.)

Within the boundaries established by Evidence Code section 1150, evidence that the internal thought processes of one or more jurors were biased is ordinarily inadmissible to impeach a verdict. Instead, a jury's impartiality may be challenged only "by evidence of 'statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly,' but '[n]o evidence is admissible to show the [ actual ] effect of such statement, conduct, condition, or event upon a juror … or concerning the mental processes by which [the verdict] was determined.' [Citations.] Thus, where a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias." (<u>In re Hamilton</u>, <u>supra</u>, 20 Cal.4th at p. 294, fn. omitted, italics added by <u>Hamilton</u>.)

When reviewing a trial court's ruling on a new trial motion based on juror misconduct, we exercise independent review of the issue of prejudice but accept the factual findings of the trial court if supported by substantial evidence. (<u>People v. Dykes</u>, <u>supra</u>, 46 Cal.4th at p. 809.)

B. The Evidence and Motions for New Trial

After the verdicts were returned, Juror No. 5 wrote a letter to the court describing an outburst by Juror No. 9 that occurred during deliberations. The court decided to investigate the outburst by inviting any juror, on a voluntary basis, to participate in answering questions about the events that Juror No. 5 had described. The court asked for, and all parties submitted, proposed questions to be posed to the jurors willing to participate, and the court noted the questions as drafted by May's counsel "were what [the court was] looking for," although many of those questions were variants of the questions proposed by the prosecution and Berardi's counsel. The court elected to use the questions drafted by May's counsel, with some modifications, and proceeded to interview the six jurors who volunteered to

participate. Juror No. 9, the only black juror on the panel, did not agree to participate.

Juror No. 1:

Juror No. 1 stated all jurors participated in the deliberations "to some extent," and that Juror No. 9 was a more active participant at the beginning of the deliberations. Juror No. 1 said that Juror No. 9 was not inattentive, but did not watch the security system tapes when the rest of the jury chose to watch them because he felt he already "knew everything he needed to know." Juror No. 1 was one of the two or three jurors who voted to convict after viewing the security system tapes, which was the verdict that Juror No. 9 "thought we should have reached from the beginning."

Juror No. 9 did appear hostile, and turned his back toward other jurors. Juror No. 9 expressed the opinion the rest of the jurors were "taking too long" in their deliberations, and stated (either just after or just prior to the conclusion of jury deliberations) that "if it had been a white boy on the ground and a black boy who had done the shooting ... it wouldn't have taken us five minutes to reach the verdict." When Juror No. 1 responded angrily by saying, "How dare you consider me a racist," Juror No. 9 repeatedly said "If the shoe fits, wear it." Juror No. 1 indicated Juror No. 9's outburst seemed "farfetched" because none of the jurors made any overt mention of the race of the victim or the defendants while deliberating.

Juror No. 3:

Juror No. 3 stated all jurors participated in the deliberations, and no juror refused to review or consider any evidence. Juror No. 3 described an outburst, which he believed occurred the day before the jury reached its common verdict, and said "there was a race card played which turned some of the jurors off," because Juror No. 9 said "if there was a white man shot by a black man ... this would all be over very early." The outburst angered a lot of the jurors, but "[i]t died down."

Juror No. 5:

Juror No. 5 described Juror No. 9 as disrespectful, because Juror No. 9 spent some of the time with his back towards the other jurors and at times scoffed or made "noises," like he had made up his mind and anyone who disagreed with him would incite Juror No. 9 to say things like "You just don't get it" or "You don't understand." Although Juror No. 9 acted "aloof ... with his back turned to us, he was participating ... and he did contribute some in the arguing." There were three jurors who believed the defendants were not guilty or not guilty as charged, but two of them had changed their minds and one was "still half and half" before Juror No. 9's outburst, but the jury became unanimous after the outburst. Juror No. 3 stated "we were 99–percent done and I thought that we were doing good [and] when that tirade started, it was astonishing. It was so out of place. It was not needed." The unanimous verdict was reached within 10 or 15 minutes after the outburst.

By the time of the outburst, the arguments of the jurors in favor of acquittal had been "thinning," and several other jurors scolded Juror No. 9 for his outburst. Juror No. 5 stated the outburst did not change the verdict but may have "sped us along" in the direction the jury was already heading.

Juror No. 11:

Juror No. 11 stated all jurors participated in the deliberations, and no juror refused to review or consider any evidence, although it "might have appeared at times" that Juror No. 9 was inattentive because he had his back to the jury looking at a picture on the wall. The only time the race of the victim or the defendants was discussed was after the verdicts had been reached, and Juror No. 11 also believed it may have occurred after the verdicts had been signed, when Juror No. 9 said words to the effect of "[i]f this had been a white man, we would have done this a long time ago," which elicited groans and one stern response. Juror No. 11, who described the deliberations as "an ordeal," said there were arguments between jurors over the facts that "would get a little testy" (some of which involved Juror No. 9 and others in which Juror No. 9 was not involved), but these did not seem to have intimidated or placed undue pressure on any juror.

Juror No. 12:

Juror No. 12 stated all jurors participated in the deliberations and no juror was inattentive or refused to review or consider any evidence. Juror No. 12 stated that Juror No. 9 at times exhibited nonverbal and verbal behavior that Juror No. 12 interpreted as expressing a belief by Juror No. 9 that the other jurors were naïve or lacked the experience that Juror No. 9 had with crime, including rolling his eyes or saying, "In my neighborhood, we know what a gunshot sounds like." Juror No. 9 was listening and participating and it was "[j]ust the nature of his participation was somewhat unattractive at times." The emotional outburst came on the last day, after all of the jurors had agreed on the verdict, when Juror No. 9 said, "If [the victim] had been white, it wouldn't have taken you so long," which angered some of the other jurors. Although Juror No. 12 was one of the three jurors originally unconvinced beyond a reasonable doubt, Juror No. 12 was actually surprised there had not been more racial tension in the jury room and, when Juror No. 9 made his statement, Juror No. 12 "could see the truth in what he was saying. It wasn't real diplomatic, but that was from his frame of mind. I think that was certainly a possibility ."

Juror No. 2:

Juror No. 2 stated all jurors participated in the deliberations, "[s]ome more than others," and that Juror No. 9 would often not say anything, but "every once in a while, he would contribute what he thought was important." Although he had his back to group most of the time, he was not inattentive and "you could tell that he was listening ... [from] his body language." Juror No. 2 said the outburst came at the end of the deliberations. At that point, when the vote was 11 to 1 in favor of conviction, the last hold-out (apparently seeing the handwriting on the wall) started to cry and said, "I just wish there is some other way. It is so hard to say this. It is obvious, but I wish there was some other way." Juror No. 9 got really annoyed and said, "If this had been a white boy that had been killed by two black boys, he would have been tried and hung by now," and when the others chastised Juror No. 9 for that comment, he said, "if the shoe fits, wear it." Other than that occasion, the race of the victim and the defendants was not mentioned in the deliberations.

The Motions for New Trial

After receiving the evidence, the court provided all parties an opportunity to file written motions for and in opposition to a new trial.

14

13cv1598-BTM (BLM)

Both Berardi and May argued the evidence showed Juror No. 9 was actually biased against them and that bias warranted a new trial.FN8 May also asserted Juror No. 9's inattentiveness, refusal to deliberate, and intimidation of other jurors was misconduct warranting a new trial, and Berardi appeared to echo May's claim that the jury was intimidated or rushed into its verdict by Juror No. 9. The prosecution opposed the motion, arguing the evidence did not show (1) Juror No. 9 held biases against the defendants so that as a demonstrable reality Juror No. 9 was unable to perform his duty as a juror, (2) Juror No. 9 was either inattentive or refused to deliberate, or (3) Juror No. 9 had committed misconduct by intimidating the other jurors into convicting the defendants.

FN8. Although both defendants also alleged Juror No. 9 committed misconduct because he had improper contact with the victim's family during trial, the court asked the jurors about this allegation and, in denying the new trial motions, found there was no corroborating evidence of improper communication between Juror No. 9 and anyone associated with either side. Because substantial evidence supports the finding that there was no improper contact, and neither party resurrects that particular claim on appeal, we do not further consider it.

The Ruling

The court, recognizing it was to employ the three-step analysis as outlined in People v. Sanchez, supra, 62 Cal.App.4th at page 475 to assess the defense claims of juror misconduct, acknowledged the first step was problematic because the evidence elicited by the questions the parties agreed on comprised a "mixed bag of admissible and potentially inadmissible evidence." FN9 The court concluded the evidentiary problems would not preclude the court from evaluating the second step—whether there was any actual misconduct—and ruled there was not misconduct. The court observed that:

FN9. The court acknowledged that "a lot of statements attributed to Juror Number 9 that isolated in and of themselves probably would not be admissible [as] reflecting on the thought processes of that particular juror in reaching a determination in the case." The court also recognized that some of the questions asked jurors to give opinions on "the thought processes or effects that certain statements [by Juror Number 9] would have [on the juror]."

"the way that Juror Number 9 conducted himself … is not the way we'd like to see it handled [and] … it would have been more appropriate had he been more courteous [to other jurors]. But [the jurors who testified] never said that he was inattentive, [or] somehow disregarded the law…. He was confrontational at times … but that's nothing more than we see in murder juries all the time…. [¶] … [T]here was nothing … to suggest to me that Juror 9's activity was anything more than … unpleasant…. [The other jurors] didn't like it, but they didn't let it affect them."

C. Analysis

We conclude the trial court did not abuse its discretion in denying the motions for new trial. May and Berardi's first set of claims—that Juror No. 9 was inattentive or refused to deliberate—was rejected by the trial court, and the jurors' answers to the questions posed by the parties provide ample evidentiary support for the trial court's factual finding. Although Juror No. 9 may have elected to seat himself in a discourteous manner, he was not physically separating himself from the other

15

jurors to avoid participating. FN10 To the contrary, Juror No. 5 affirmed that, while Juror No. 9 as acting "aloof ... with his back turned to us, he was participating ... and he did contribute some in the arguing" (italics added), and Juror No. 2 stated that even when Juror No. 9 had his back to group he was not inattentive and " you could tell that he was listening ... [from] his body language." (Italics added.) Moreover, the fact that Juror No. 9 was an early advocate for conviction, and may have been uninterested in viewing a security tape toward the end of the deliberations, does not equate with a "refusal to deliberate." In People v. Cleveland (2001) 25 Cal.4th 466, the Supreme Court (dealing with the analogous problem of whether a juror may be discharged for misconduct because he does not deliberate) defined the phrase "refusal to deliberate" to mean a juror's "unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." ( Id. at p. 485.) Importantly, the Cleveland court noted the circumstance that a juror does not deliberate well or relies on faulty logic or analysis does not constitute a refusal to deliberate and, similarly, "the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussions will not alter his or her views." (Ibid.)

FN10. Berardi, noting the evidence that Juror No. 9 declined invitations from other jurors to lunch with them during trial, suggests this was further evidence that he was trying to separate himself from other jurors. However, there are multiple reasons Juror No. 9 may have chosen to spend his lunch break on his own (e.g., running his business, meeting friends or family for lunch, shopping, etc.), all of which are much more benign than the nefarious inference Berardi urges.

The principal argument by May and Berardi is that Juror No. 9 held racially-based biases against the defendants so that he was unable to perform his duty as a juror, which amounted to misconduct.FN11 However, the courts have repeatedly held bias will not be presumed and an alleged bias that renders a juror unable to perform his or her duty as a juror must appear in the record as a "demonstrable reality." (See, e.g., People v. Beeler (1995) 9 Cal.4th 953, 975; People v. Holloway (2004) 33 Cal.4th 96, 124–125.) The only overt evidence cited by May and Berardi to support their claim that Juror No. 9's racial prejudice rendered him unable to perform his duty as a juror was the single comment by Juror No. 9 that he believed the jury would have reached a verdict much more quickly had the case involved a white man shot by a black man.FN12 However, the evidence showed this statement was the only reference ever made by Juror No. 9 to the respective races of the parties. Moreover, the evidence showed Juror No. 9's statement came after lengthy deliberations FN13 and could well be understood to reflect his bewilderment that, in what appeared to him to be a clear case (where May confessed to the shooting and Tong's testimony clearly showed Berardi orchestrated Kegler's rendezvous with May and had foreknowledge of the need for an alibi), the lone hold-out was still reluctant to convict the defendants. Indeed, because the evidence appeared to show his comment came only after these lengthy deliberations had moved the vote to 11 to 1 in favor of conviction, and was in response to the last hold-out's crying and saying, "I just wish there is some

other way…. It is obvious, but I wish there was some other way" (italics added), it appears Juror No. 9's comment did not reflect any racial bias that rendered him unable to perform his duty as a juror, but instead was a vocalization of his perception that other jurors were unduly reluctant to perform their duties to convict the defendants.

FN11. Berardi also argues the order denying the new trial motions must be reversed because the court improperly admitted and considered evidence from the jurors reflecting on the jury's decision making process, because the court asked each juror whether they were intimidated by Juror No. 9's outburst, and the court found Juror No. 9's alleged misconduct "had virtually no impact" on the jury's decision making process, "did not improperly influence or sway any particular juror," and did not compel any juror "to vote one way or the other." Certainly, the courts have ordinarily limited evidence challenging a jury's impartiality to evidence of statements made, or conduct, conditions, or events occurring in the jury room of such a character as is likely to have influenced the verdict improperly, but cautioned that " '[n]o evidence is admissible to show the [ actual ] effect of such statement, conduct, condition, or event upon a juror … or concerning the mental processes by which [the verdict] was determined.' " ( In re Hamilton, supra, 20 Cal.4th at p. 294, italics added by Hamilton.) However, the questions posed by the court were largely agreed on by the defense, and therefore any alleged error as to the admission of the evidence must be deemed invited. More importantly, Berardi affirmatively alleged a new trial was warranted because Juror No. 9's conduct intimidated the jury into convicting Berardi, and thus invited the court to make the findings he now criticizes on appeal. We conclude any error in the admission of the evidence or the findings made below was invited error.

FN12. Berardi's attempt to buttress his claim of racial bias by inferring that other comments and actions by Juror No. 9 were attributable to racial bias. For example, Berardi cites Juror No. 12's testimony-that Juror No. 9 said, "In my neighborhood, we know what a gunshot sounds like," and gave nonverbal indications that he thought the other jurors were naïve compared to his own experience-as showing Juror No. 9 was biased. However, such comments do not constitute misconduct. "Indeed, lay jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process. 'That they do so is one of the strengths of the jury system. It is also one of its weaknesses…. Such a weakness, however, must be tolerated.' " ( People v. Pride (1992) 3 Cal.4th 195, 268.) May argues Juror No. 9's racial bias was buttressed by the allegation that, on the morning Berardi's counsel was scheduled to give his closing argument, Juror No. 9 was seen sitting outside the courtroom (apparently waiting for proceedings to begin) and was in the vicinity of Kegler's family and the witness "[thought] he was engaged in [Kegler's] family's conversation." However, the court questioned each juror about that allegation, and all denied any knowledge of improper contact, and the court found that allegation lacked any corroboration.

FN13. Jury deliberations began on the afternoon of January 13, 2009, and did not conclude until January 22, 2009, and involved nearly four full days of deliberations.

Because the evidence does not show, as a "demonstrable reality," that Juror No. 9 was unable to adjudge the matter impartially, we reiterate our high court's caution that "before a unanimous verdict is set aside, the likelihood of bias … must be substantial…. [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function

13cv1598-BTM (BLM)

1

2

3

4

at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." ( In re Carpenter, supra, 9 Cal.4th at pp. 654–655.) On this record, the trial court did not abuse its discretion in denying the new trial motions because the record did not show as a demonstrable reality that Juror No. 9 was actually biased or that he refused to deliberate or follow the court's instructions.

Lodgment 12 at 9-22.

The United States Supreme Court has "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Smith v. Phillips, 455 U.S. 209, 215 (1982); Remmer v. United States, 347 U.S. 227, 228-29 (1954) (remanding case to district court to "hold a hearing to determine whether the incident complained of was harmful to the petitioner"). "Actual bias is, in essence, 'bias in fact'–the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." United States v. Olsen, 704 F.3d 1172, 1189 (9th Cir. 2013) (quotations and citation omitted). "While actual bias may be revealed by a juror's explicit admissions, more typically it is demonstrated through circumstantial evidence." Id. A defendant bears the burden of proving actual bias. Id.

In Smith, one of the jurors applied during trial to the prosecuting agency for a position as an investigator. 455 U.S. at 212. The attorneys prosecuting the trial learned of the application during trial but decided not to notify the trial judge. Id. After trial, the District Attorney learned of the application and notified defense counsel and the trial judge. Id. at 213. Defense counsel moved to set aside the verdict and the court conducted a hearing during which he heard from the juror and prosecuting attorneys. Id. At the conclusion of the hearing, the judge found that the juror's application was "indeed an indiscretion but that it in no way reflected a premature conclusion as to the [respondent's] guilt, or prejudice against the [respondent], or an inability to consider the guilt or innocence of the [respondent]" and denied the motion to set aside the verdict. Id. The district court addressing petitioner's federal habeas due process claim "found insufficient evidence to demonstrate that Smith was actually biased" but "imputed bias to Smith because 'the average man in Smith's position would believe that the verdict of the jury would directly affect the evaluation of his job application.'" Id. at 214. The court of appeals

1  affirmed.  Id.  The Supreme Court reversed, holding that a post-trial hearing during which the

2  defendant is given an opportunity to prove actual bias by a juror is all that is required to satisfy

3  the requirements of the Due Process Clause and to decide allegations involving juror partiality.

4  Id. at 216-218.  In reaching this conclusion, the Court also noted that "[o]f equal importance,

5  this case is a federal habeas action in which [the court's] findings are presumptively correct

6  under 28 U.S.C. § 2254(d)."  Id. at 218.

7         The Ninth Circuit recently reaffirmed the applicability of the Smith decision in a federal

8  habeas case involving alleged juror bias.  Hedlund v. Ryan, 750 F.3d 793 (9th Cir. 2014).  In

9  Hedlund, the petitioner argued that he was denied his right to a fair and impartial jury when the

10  trial court failed to dismiss a juror who was a distant relative of the victim.  Id. at 805.  In

11  response to a letter from the juror on the second day of trial, the court held a hearing in

12  chambers during which the juror was questioned by the judge and defense counsel.  Id.  The

13  juror explained her distant relationship to the victim and stated that she could maintain

14  impartiality.  Id.  Petitioner's counsel moved to strike the juror for cause and the court denied

15  the motion.  Id.  The Arizona Supreme Court affirmed the trial court, finding that "nothing in the

16  record suggested the Juror was untruthful in stating she could be fair and impartial."  Id.

17         In his federal habeas petition, Hedlund challenged the adequacy of the in-chambers

18  hearing and the factual basis for the judge's conclusion that there was no actual bias, as well as

19  asserting that in the alternative, bias should be inferred.  Id. at 806.  The district court rejected

20  petitioner's arguments and the Ninth Circuit affirmed.  Id. at 806-07.  In reaching this conclusion,

21  the court reiterated that the "appropriate course of action" for allegations of juror bias is to hold

22  "a hearing in which the defendant has an opportunity to prove actual bias."  Id. at 806.  The

23  court found that the in-chambers hearing was sufficient and that the Supreme Court did not

24  impose any specific requirements regarding the length of the hearing or notice provision.  Id.

25  The court also upheld the trial judge's factual conclusions, stating that "[s]o long as the fact-

26  finding process is objective and reasonably explores the issues presented,  the state trial judge's

27  findings based on that investigation are entitled to a presumption of correctness."  Id. (quoting

28  Dyer v. Calderon, 151 F.3d 970, 974–75 (9th Cir. 1998)).  The court also rejected petitioner's

claim for implied bias, noting that "[t]here is no clearly established law regarding the issue of implied bias" and that the Ninth Circuit has only "presumed bias on a rare occasion" including close personal relationships or a juror's lies, but that those cases do not represent clearly established federal law.  Id. at 808.  Because the trial court conducted an appropriate hearing and the fact-finding process was objective and reasonable, the Ninth Circuit affirmed the district court's conclusions that petitioner failed to demonstrate actual bias and that the trial court complied with clearly established federal law.  Id.

The trial court in the instant case also conducted an appropriate investigation into the juror misconduct and bias allegations and determined that there was no misconduct or actual bias.  After the verdicts were returned, Juror No. 5 sent a letter to the court describing an "outburst" by Juror No. 9.  Lodgment 4 at 1937.  After receiving the letter and communications from other jurors who had been contacted by defense investigators, the court decided to investigate the comments made by Juror No. 9 by holding a hearing.  Id. at 1935-1950.  The court invited every juror to come to the courthouse to be interviewed by the judge.  Id.  The court asked counsel for all of the parties to submit questions they wanted posed to the jurors.  Id. at 1960.  The trial judge reviewed counsels' proposed questions, acknowledged that many of them were similar, and selected the questions submitted by Defendant May's counsel, with slight modifications.  Id.

The Court held a closed hearing on the record on April 3, 2009.  Id. at 1960-2007.  Appearing at the hearing was Mr. Koerber for the People, Mr. Rojo for Petitioner, Mr. Mohun and Ms. Velker for Defendant May, and the six jurors who testified.  Id. at 1960.  Petitioner and Defendant May were not present.  Id. at 1947-1948 (trial judge stated that he did not want the jurors to "color their statements based upon the fact that [Petitioner] and Mr. May are present here" and requested that counsel obtain waivers from Petitioner and Mr. May) and 1960.  At the conclusion of the hearing, the trial judge scheduled a second hearing to address Petitioner's (and his co-defendant's) motion for a new trial based on juror bias and misconduct.  Id. at 2019.

Petitioner filed a motion for new trial setting forth his argument based upon the jurors' testimony.  Id. at 1951.  Petitioner was present for the May 21, 2009 hearing and the court

provided counsel with an opportunity to orally argue the motion.  Id. at 1951-57.[4]  At the

conclusion of the hearing, the court denied the motion, finding first that the court could "consider

or make a determination as to what evidence it can consider in the matter and hold an

evidentiary hearing where we can make a determination as to what took place" and that this step

was "not a stumbling block to granting the motion, or at least hearing the motion." Id. at 1952.

Next the court found that there was no actual misconduct in the case and noted that "there's

nothing to suggest that in and of itself constitutes misconduct upon which we'd set aside the

verdict in this particular case." Id. at 1953.  While the court found that Juror No. 9 did not

handle himself in the ideal way during deliberations, he was not inattentive or in disregard of the

law. Id. at 1953-54.  The judge summarized

> its unfortunate that whoever is going to review that is not going to have had ... the
> opportunity that we've had to actually see the people talk and hear the answers
> [to] the questions that were posed.  Frankly, for what it's worth, there was nothing
> in any statement made by any of those witnesses in response to any question I
> posed to them to suggest to me that juror 9's activity was anything more than an
> unpleasant ... addition to an already unpleasant experience having to sit on a
> murder case.  It simply did not affect their decision-making in any way whatsoever.

Id.  When asked by defense counsel about Juror No. 9's bias, the trial judge denied counsel's

request for a hearing where Juror No. 9 was required to testify, stating that "[t]here was

certainly plenty of evidence presented to this court as to what he did or what he did not do, and

more than sufficient evidence presented to the court to determine what effect, if any, it had on

other jurors.  And this court's conclusion was that it had none." Id. at 1955-56.  When pressed

again, the court indicated that it did not see any evidence of bias on behalf of Juror No. 9; "he

simply made a decision when he got in there adverse to your clients." Id. at 1956.

On October 30, 2009, the judge presided over a second motion for a new trial based upon

the juror bias allegation. Id. at 2031-41.  Petitioner filed a brief and orally argued the motion.

Id.  The motion presented two arguments: (1) that the hearing during which the jurors' testified

---

[4]The transcript of this hearing also is contained in Lodgment 4 at 2022-30.

was inadequate and (2) that the hearing violated California Evidence Code Section 1150.[5]  Id. Petitioner argued that the juror interviews fell short of the required evidentiary hearing as counsel was unable to speak, object, or question the jurors.  Id. at 2034.  Petitioner also argued that the court improperly denied his request for a full evidentiary hearing, including cross-examination by counsel.  Id. The court denied Petitioner's motion, confirmed its previous ruling, and restated that "the actions of Juror 9 did not affect the panel in any way [and] did not constitute misconduct in any way."  Id. at 2037-2039.

As set forth in more detail in the appellate opinion quoted above, the appellate court reviewed the hearings conducted by the trial judge and affirmed the trial court's ruling, finding that (1) there was ample evidence supporting the trial court's conclusion that Juror No. 9 had participated in the jury deliberations and had not engaged in any type of misconduct, and (2) that there was no evidence showing a "demonstrable reality" that Juror No. 9 was racially biased or that he was "unable to adjudge the matter impartially."  Lodgment 12 at 9-22.  The court explained that Juror No. 9 only made one racially-based comment and it came at the end of lengthy deliberations in a case that Juror No. 9 considered clear and after the lone holdout stated "I just wish there is some other way. ... It is obvious, but I wish there was some other way." Id. at 21-22.  The court also concluded that Juror No. 9's statement "did not reflect any racial bias that rendered him unable to perform his duty as a juror, but instead was a vocalization of his perception that other jurors were unduly reluctant to perform their duties to convict the defendants."  Id. at 22.

The United States Supreme Court does not require the partiality hearing to be conducted in a specific manner.  Smith, 455 U.S. at 217-18.  The Ninth Circuit has applied the Smith hearing requirement to a variety of situations and concluded that "[a]s long the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on

---

[5]The record incorrectly cites Evidence Code Section 1550, but later cites Section 1150.  Lodgment 4 at 2031 Petitioner has not raised the Evidence Code challenge in this federal habeas petition and this Court does not have jurisdiction to review issues of state law so the Court will not discuss this argument.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

that investigation are entitled to a presumption of correctness." <u>Hedlund</u>, 750 F.3d at 807 (citing <u>Dyer v. Calderon</u>, 151 F.3d 970, 974-75 (9th Cir. 1998)). In <u>Hedlund</u>, petitioner argued that the hearing was inadequate because it was cursory and held in chambers, defense counsel was not given sufficient time to prepare, and it was the judge's responsibility to question the juror sufficiently. <u>Id.</u> The court disagreed, finding that sufficient questions were asked of the juror and defense counsel was given adequate time to prepare. <u>Id.</u>

In this case, Petitioner had an opportunity to submit questions to the judge to explore any concerns regarding bias and misconduct. Petitioner took advantage of the opportunity and submitted questions. Petitioner also briefed and argued juror bias and misconduct. The trial judge examined the jurors to determine what happened and whether Juror No. 9 engaged in misconduct or was racially biased.[6] The trial judge repeatedly and explicitly found that there was no misconduct. While the judge did not explicitly state that there was no evidence that Juror 9 was biased, the judge's comments can be read to indicate that he viewed bias as a type of misconduct and that he did not find any evidence that Juror No. 9 had prejudged the case; Juror No. 9 "simply made a decision when he got in there adverse to your clients."[7] <u>Id.</u> at 1956.

As discussed at length above, the appellate court addressed and rejected Petitioner's bias argument and there is legal and factual support for that determination. Under AEDPA's highly deferential standard for evaluating state court rulings, this Court finds that the state court's

---

[6]In the trial court, Petitioner argued that he did not have an adequate opportunity to establish bias because he was not able to examine Juror No. 9. Lodgment 4 at 1955-57. Petitioner does not present this argument in his FAP or Traverse and therefore has waived it. In addition, Petitioner has not provided, and this Court has not found, Supreme Court law requiring that the allegedly biased juror testify at the partiality hearing. Rather, the law requires that Petitioner have an opportunity to prove bias. <u>Smith</u>, 455 U.S. at 215. And, as noted by the Ninth Circuit, actual bias typically is established through circumstantial evidence. <u>See Olsen</u>, 704 F.3d at 1189. As such, even though Juror No. 9 did not testify, Petitioner had an adequate opportunity to establish bias.

[7]In habeas proceedings, such as this case, a "trial judge's findings are 'presumptively correct' and cannot be overcome without clear and convincing evidence." <u>Hedlund</u>, 750 F.3d at 807 (quoting <u>Smith</u>, 455 U.S. at 218). Petitioner has not provided the requisite clear and convincing evidence that these findings are incorrect. Moreover, the trial judge noted the importance of the juror's live testimony. Lodgment 4 at 1953-54; <u>see Rushen v. Spain</u>, 464 U.S. 114, 120 (1983) ("Here, both the state's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of 'fact'–on a question the state courts were in a far better position than the federal courts to answer–deserves a "high measure of deference, ... and may be set aside only if it 'lack[s] even fair support in the record.'"). There was significantly more than "fair support" in the record to uphold the state courts' findings and conclusions.

13cv1598-BTM (BLM)

1  decision was not "objectively unreasonable." See Richter, 131 S.Ct. at 786 ("A state court's

2  determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

3  jurists could disagree' on the correctness of the state court's decision."); Yarborough v. Gentry,

4  540 U.S. 1, 4 (2003) (a federal habeas court applies an extraordinarily deferential review,

5  inquiring only whether the state court's decision was objectively unreasonable).

6       Petitioner's final argument on this issue is that the state court's decision in this case was

7  an unreasonable determination of the facts.  Pet. at 13-17; Traverse at 5-7.  Petitioner's

8  argument is premised on Juror No. 9's statement during deliberations that it would not have

9  taken so long to reach a guilty verdict if the victim had been white and the defendants had been

10 black.  Id.  Petitioner acknowledges that the jurors had slightly different recollections of the

11 actual words stated by Juror No. 9 and the timing of the statement.  Id. at 13.  In making his

12 argument, Petitioner relies heavily on the statements by Juror No. 5 that Juror No. 9's outburst

13 "may have sped [the jury] along," "may have bumped a couple of people who were on the

14 fence," and "might have bumped them in the direction we wound up."  Pet. at 15-17; Traverse

15 at 5-7.  Petitioner asserts that these statements make the appellate court's conclusions that there

16 was only one holdout and that Juror No. 9 was not biased, unreasonable.  Id.

17      There is ample evidence supporting the appellate court's conclusion.[8]  For example, all of

18 the jurors testified that race was not an issue in the deliberations and that the only time it was

19 raised was in the one statement by Juror No. 9.  Id. at 1961-2018.  All of the jurors also agreed

20 that Juror No. 9's statement, while inappropriate, did not constitute undue pressure to convict.

21 Id.  Specifically, Juror No. 1 testified that Juror No. 9. was hostile, but not inattentive, and that

22 although she was briefly intimidated, it did not alter the deliberations or her conclusions.  Id. at

23 1963.  Juror No. 3 explained that he was in no way intimidated or influenced by Juror No. 9's

24 racial statement and that while other jurors may have been angered by the statement, he did

---

26  [8]In his FAP, Petitioner asserts that additional evidence of Juror No. 9's bias and misconduct was that he sat

27  near and spoke with the victim's parents in defiance of the court's order.  FAP at 13.  However, the appellate court
found no evidence to support this allegation and that the defendants had abandoned this claim on appeal.  Lodgment
12 at 17 n. 8.  The trial record firmly supports the appellate court's holding as all of the jurors testified that they did

28  not see any inappropriate contact between Juror No. 9 and the victim's family.  Lodgment 4 at 1961-2018.

not believe that it impacted any juror's ability to "assess all of the evidence in [the] case."  Id. at 1974-1975.[9]  Juror No. 11 did not recall any juror being inattentive or intimidated during deliberations and stated that the outburst came after everyone had reached their decision.  Id. at 1989-1990.  Juror No. 2 testified that everyone participated during deliberations and no one seemed intimidated or willing to change their vote in response to Juror No. 9's outburst which occurred before the jurors took their last vote and when the jury was 11-1 in favor of finding Petitioner guilty.  Id. at 2008-2012.  Juror No. 2 made the specific statement quoted by the appellate court that Juror No. 9 made the statement after the final holdout juror started to cry and lamented that she wished there was some other way.  Id. at 2012; Lodgment 12 at 22. Juror No. 2 explained that she thought Juror No. 9's outburst was based upon his annoyance with the process.  Lodgment 4 at 2012-13.  Juror No. 12 testified that it did not appear that any juror was intimidated by the conduct of any other juror and that no one appeared to have changed their position based on what Juror No. 9 said.  Id. at 1996-1999.  She further testified that Juror No. 9's outburst came on the last day after all of the jurors had reached a decision. Id. at 2003-2004.  Finally, Juror No. 12 stated that she "was surprised there wasn't more racial tension" during deliberations.  Id. at 2004.  She explained that while Juror No. 9's statement wasn't "real diplomatic," she could understand his position and "frame of mind."  Id.

In addition, Juror No. 5's testimony is ambiguous and can be interpreted to support both Petitioner's argument and the court's ruling.  For example, while Juror No. 5 testified that the outburst "may have sped us along" and "may have bumped a couple of the people who were on the fence" in the direction of guilty, she also opined that the outburst "might have made a difference, but it is hard to say.  It was so close."  Id. at 1981, 1984-84.  Juror No. 5 explained that there were three jurors who voted for not guilty but two of them had switched to guilty before Juror No. 9's outburst and the sole remaining juror continued to deliberate after the outburst.  Id. at 1980, 1984-85.  She also stated that they "were 99-percent done" when Juror No. 9 made his statement and they reached their unanimous verdict about "ten or fifteen

---

[9] Juror No. 3 believed that the outburst occurred the day before the jury reached a verdict.  Id. at 1976.

1  minutes" later. Id. at 1980-81.  Finally, Juror No. 5 stated that although it was a close call, Juror

2  No. 9 "didn't intimidate." Id. at 1983.  As such, the state court's factual determinations were not

3  objectively unreasonable.  See Miller-El, 537 U.S. at 340; Rice, 546 U.S. at 341-42 (the fact that

4  "[r]easonable minds reviewing the record might disagree" does not render a decision objectively

5  unreasonable).

6  The Court finds that the trial court's handling of the allegations of juror misconduct and

7  bias and Petitioner's motion for a new trial were reasonable and in accordance with clearly

8  established federal law.  The trial court's fact finding process was "objective and reasonably

9  explored the issues presented [and, therefore,] the state trial judge's findings based on that

10 investigation are entitled to a presumption of correctness." Hedlund, 750 F.3d at 807.  There

11 was substantial evidence supporting both the trial and appellate courts' factual findings and

12 conclusions.  Petitioner did not establish actual bias, that is "a state of mind that leads to an

13 inference that the person [did] not act with entire impartiality." Olsen, 704 F.3d at 1189.

14 Because Petitioner was given an opportunity to establish actual bias and the trial court's factual

15 determinations were reasonable, the appellate court's decision to deny Petitioner's claim was not

16 contrary to, and did not involve an unreasonable application of clearly established federal law

17 and was not based on an unreasonable determination of fact.  Accordingly, the Court

18 **RECOMMENDS** that Petitioner's claim for juror bias be **DENIED**.

19 **B.    Ineffective Assistance of Counsel**

20 Petitioner argues that his appellate counsel on direct review provided ineffective assistance

21 of counsel when he failed to argue that Petitioner's constitutional rights were violated when he

22 was not permitted to testify at trial.  FAP at 22-33; Traverse 9-10.  Petitioner acknowledges that

23 his desire to testify was never communicated to the trial judge and explains that this failure was

24 because his trial counsel did not want him to testify, did not tell him that he had a right to insist

25 on testifying, and did not move to reopen the trial when Petitioner stated his clear desire to

26 testify. FAP at 22-28.  Petitioner argues that this constitutional violation is a structural error and

27 that, therefore, he is entitled to have his petition granted and conviction reversed, regardless of

28 any prejudice.  Id. at 28-30.  Petitioner further argues that the ineffective assistance of counsel

standard is not applicable to this error but, even if it were, it also requires that the petition be granted.  Id. at 30-34.  Respondent contends that Petitioner's ineffective assistance of counsel claim is untimely and meritless.  Id. at 22-26.

### 1.    Timeliness of the Claim

The AEDPA imposes a one-year statute of limitations on federal petitions for writ of habeas corpus filed by state prisoners.  28 U.S.C. § 2244(d) (West Supp. 2012).  Section 2244(d)'s one-year limitations period applies to all habeas petitions filed by persons in "custody pursuant to the judgment of a State court."  Id. § 2244(d)(1).  The one-year limitations period runs from the latest of:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id. § 2244(d)(1)(A)-(D).

Here, the California Supreme Court denied Petitioner's petition for review on April 11, 2012.  Lodgment 13.  Petitioner did not file a petition for certiorari with the United States Supreme Court so the statute of limitations began to run ninety days later on July 10, 2012. Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999) (limitations period does not begin until after expiration of ninety-day period for seeking certiorari).  Absent tolling, the limitations period began to run the next day and expired one year later on July 10, 2013.  28 U.S.C. § 2244(d). Petitioner filed a federal petition for writ of habeas corpus on July 9, 2013 and an amended federal petition on July 15, 2013 asserting the same two claims, so the exhausted claim (juror bias) asserted in the FAP is timely.  ECF Nos. 1 & 6.  The filing of a federal habeas petition does not toll the statute of limitations (see Duncan v. Walker, 533 U.S. 167, 181 (2001)) so the unexhausted ineffective assistance of counsel claim is not timely unless the ineffective assistance

1   of counsel claim is sufficiently tolled or relates back to the timely and exhausted juror bias claim.

2           a.      <u>Statutory Tolling</u>

3         The AEDPA tolls its one-year limitations period for the "time during which a properly filed

4   application for State post-conviction or other collateral review . . . is pending."   28 U.S.C.

5   §2244(d)(2); <u>Trigueros v. Adams</u>, 658 F.3d 983, 988 (9th Cir. 2011).  "An untimely state petition

6   is not 'properly filed' and does not trigger statutory tolling under AEDPA."   <u>Trigueros</u>, 658 F.3d

7   at 988 (citing <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 417 (2005)).  The issue in this case is whether

8   Petitioner's state habeas petition filed in the California Supreme Court on July 10, 2013, was

9   timely and therefore "properly filed."

10         The California Supreme Court summarily denied the claim on January 21, 2014.  ECF No.

11   19-1.  A summary denial is presumed to be a decision on the merits, however, it is not a

12   determination that a petition was timely.  <u>Trigueros</u>, 658 F.3d at 989-990; <u>see also</u> <u>Evans v.</u>

13   <u>Chavis</u>, 546 U.S. 189, 197 (2006); <u>Walker v. Martin</u>, 131 S.Ct. 1120, 1124 (2011).  In situations

14   such as this, where the state court does not expressly indicate whether a petition is timely or not,

15   the federal habeas court "must itself examine the delay in each case and determine what the

16   state courts would have held in respect to timeliness."  <u>Evans</u>, 546 U.S. at 198.  In making this

17   determination, the Ninth Circuit has stated

18       California courts apply a general reasonableness standard when determining
whether a habeas petition is timely filed in state court.  Under California's standard,

19   a habeas petition should be filed as promptly as the circumstances allow.  This
means that a prisoner must seek habeas relief without substantial delay.  In non

20   capital cases, to avoid the bar of untimeliness with respect to each claim, the
petitioner has the burden of establishing (i) absence of substantial delay, (ii) good

21   cause for the delay, or (iii) that the claim falls within an exception to the bar of
untimeliness.

22

23   <u>Trigueros</u>, 658 F.3d at 989 (citations and quotations omitted).  "The timeliness of a petition is

24   'measured from the time the petitioner or his or her counsel knew, or reasonably should have

25   known, of the information offered in support of the claim and the legal basis for the claim.'" <u>Id.</u>

26   (quoting <u>Clark</u>, 21 Cal. Rptr. 2d at 855).

27         Here, Petitioner knew or reasonable should have known of his ineffective assistance of

28   appellate counsel claim as soon as his appellate brief was filed because the brief did not include

1   the claim that trial counsel prevented him from testifying.   The opening brief was filed on

2   November 16, 2010. Lodgment 17. Petitioner did not file a habeas petition addressing this issue

3   until July 10, 2013, 967 days or more than two and a half years later.   Petitioner does not

4   contend that the delay was not substantial and, in fact, the law would not support such an

5   argument.   See Evans, 546 U.S. at 854 (indicating 30-60 days is the usual time allowed for

6   appellate filings and finding six months unreasonable).   Petitioner also has not established good

7   cause for the lengthy delay, as his only argument is that appellate counsel should have raised

8   the issue.   FAP at 22; Traverse at 8.   Finally, Petitioner has not established an exception to the

9   bar of untimeliness.[10]   Accordingly, the Court concludes that California courts would have found

10  that Petitioner's petition was not filed within a reasonable amount of time, was not timely, and

11  was not properly filed.   Accordingly, Petitioner is not entitled to statutory tolling.

12              b.   Petitioner is not Entitled to Equitable Tolling

13          The United States Supreme Court has held that the AEDPA's one-year statute of

14  limitations is subject to equitable tolling in appropriate cases.   Holland v.  Florida, 130 S. Ct.

15  2549, 2560 (2010).   While equitable tolling is "unavailable in most cases," Miles v.  Prunty, 187

16  F.3d 1104, 1107 (9th Cir. 1999), it is appropriate where a habeas petitioner demonstrates two

17  specific elements: "(1) that he has been pursuing his rights diligently, and (2) that some

18  extraordinary circumstance stood in his way."   Holland, 130 S. Ct. at 2562 (citing Pace v.

19  DiGuglielmo, 544 U.S.  408, 418 (2005)).   The bar is set high to effectuate the "AEDPA's

20  statutory purpose of encouraging prompt filings in federal court in order to protect the federal

21  _____

22          [10] Petitioner asserts, without argument or analysis, that the United States Supreme Court ruling in Martinez
v. Ryan, 132 S.Ct. 1309 (2012), allows federal review of his ineffective assistance of counsel claim.  FAP at 22.
23  Petitioner is wrong.  In Martinez, 132 S.Ct. at 1320, the Supreme Court held "[w]here, under state law, claims of
ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default
24  will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in
the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  The
25  Martinez decision is inapplicable to the instant case where the issue is the timeliness of the collateral challenge, rather
than an alleged procedural default.  See Nguyen v. Curry, 736 F.3d 1287, 1292-97 (9th Cir. 2013) (Ninth Circuit held
26  that Martinez governed the allegation that appellate counsel's ineffective assistance resulted in a procedural default
which prevented petitioner from raising a claim but the court conducted a separate, statute of limitations analysis to
27  determine whether the ineffective assistance of counsel claim was timely under AEDPA); Cabrera v. Pennywell, 2014
WL 1271208, *3 n. 4 (C.D. Cal. March 24, 2014) ("Martinez does not address the timeliness of a habeas petition").
28  Moreover, in this case Petitioner was not required to raise his ineffective assistance of counsel claim in "an initial-
review collateral proceeding" and he was represented by counsel in his initial collateral challenge.

1   system from being forced to hear stale claims." <u>Guillory v. Rose</u>, 329 F.3d 1015, 1018 (9th Cir.

2   2003) (citing <u>Carey</u>, 536 U.S. at 226).  Other than arguing that Petitioner's appellate counsel

3   should have raised the claim [traverse at 8], Petitioner has not presented any argument that he

4   is entitled to equitable tolling, nor has he presented any evidence that would support such an

5   argument.  <u>See</u> <u>Miranda v. Castro</u>, 292 F.3d 1063, 1065 (9th Cir. 2002) (Petitioner bears the

6   burden of establishing his entitlement to equitable tolling).  Accordingly, Petitioner is not entitled

7   to equitable tolling.

8              c.    <u>Relation Back</u>

9        Petitioner's ineffective assistance of appellate counsel claim also fails to relate back to the

10  timely filed claim of juror bias.  Federal Rule of Civil Procedure 15(c)(2) provides, in relevant part,

11  that an amended pleading may relate back to the date of the original pleading when "the claim

12  or defense asserted in the amended pleading arose out of the conduct, transaction, or

13  occurrence set forth or attempted to be set forth in the original pleading . . . ." Fed R. Civ. P.

14  15(c)(2).[11]  In 2005, the Supreme Court clarified the scope of the Rule's "conduct, transaction,

15  or occurrence" language in the habeas context, instructing that "[s]o long as the original and

16  amended petitions state claims that are tied to a common core of operative facts, relation back

17  will be in order." <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005).  However, a new claim does not

18  relate back to existing claims when the new claims depend upon events separate in "both time

19  and type" from the original claims.  <u>Id.</u> at 657.

20        Here, Petitioner's FAP contains a timely claim for violation of Petitioner's Sixth Amendment

21  Right to a fair trial due to juror bias.  FAP at 9.  The previously unexhausted and now untimely

22  claim is for ineffective assistance of appellate counsel arising out of the allegation that trial

23  counsel prevented Petitioner from testifying at trial.  FAP at 22-23.  This claim does not relate

24  back to Petitioner's claim of juror bias.  The alleged failure of Petitioner's appellate counsel did

25  not arise out of the same "conduct, transaction, or occurrence" as Petitioner's claim of juror bias.

26  _____

27        [11]The Federal Rules of Civil Procedure apply to habeas corpus proceedings "to the extent they are not
     inconsistent with" the Rules Governing § 2254 cases, Rule 11, 28 U.S.C. foll. § 2254, and "to the extent that the
28  practice in [habeas] proceedings is not set forth in statutes of the United States." Fed. R. Civ. P. 81(a)(2); <u>Henry v.
     Lungren</u>, 164 F.3d 1240, 1241 (9th Cir. 1999).

The claims are not tied to a common core of operative facts and depend upon events that are separate in "time and type" from each other. Petitioner's claim of juror bias arose during deliberations when Juror No. 9 had his outburst, while appellate counsel's alleged ineffective assistance arose during direct review of Petitioner's conviction and was premised upon the allegation that trial counsel prevented Petitioner from testifying. Accordingly, Petitioner's claim for ineffective assistance of appellate counsel cannot escape its timeliness problem by relating back to the date of the Petition or FAP.

Because Petitioner is not entitled to either statutory or equitable tolling, and because the ineffective assistance of counsel claim does not relate back to the juror bias claim in the FAP, the Court finds that the ineffective assistance of counsel claim is untimely and **RECOMMENDS** that the claim be **DENIED** on this basis.

2.    Merits of the Claim

The California Supreme Court denied Petitioner's habeas petition without analysis or citation. Lodgment 17. A summary denial, such as the one in this case, is "presumed" to be an adjudication "on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S.Ct. 770, 784-85; Williams, 133 S.Ct. at 1094. "The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely." Richter, 131 S.Ct. at 785; Williams, 133 S.Ct. at 1096 ("presumption can in some limited circumstances be rebutted"). Here, Petitioner does not argue that the supreme court's decision was not a decision on the merits and this Court finds no basis to overcome the presumption. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. at 784. The reviewing federal habeas court must "independently review" the record to determine whether the state court's decision was objectively unreasonable. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

Under clearly established federal law[12], "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).   To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  Id. at 687.  The proper measure of attorney performance is "simply reasonableness under prevailing professional norms."  Id. at 688.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  Id. at 689-690. To determine whether errors of counsel prejudiced the defense, a court "must consider the totality of the evidence before the judge or jury" and consider whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."  Id. at 696.   The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one.  Id. at 697.

The Strickland standard applies equally to claims of ineffective assistance of appellate counsel.  Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001), cert. denied, 535 U.S. 995, 122 S.Ct. 1556, 152 L.Ed.2d 479 (2002).  "Defense counsel does not have a constitutional duty to raise all nonfrivolous issues on appeal."  McGee v. Dexter, 2010 WL 2044526, * 11 (C.D. Cal. April 19, 2012) (citing Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997)).  "Appellate counsel's failure to raise an issue on direct appeal cannot constitute ineffective assistance when the 'appeal would not have provided grounds for reversal.'"  Id. (quoting Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001)).

---

[12]Petitioner argues that the Court should utilize the right to testify standard of review, rather than the ineffective assistance of counsel standard of review.  FAP at 30-32.  Petitioner admits that the only support for this argument comes from a law review article, not a court decision or statutory provision.  Id. at 30 n. 2.  The Court is not persuaded by this argument and finds that the correct standard of review is the ineffective assistance of counsel analysis provided by Strickland, 466 U.S. 668.  See Matylinsky v. Budge, 577 F.3d 1083, 1097 (9th Cir. 2009) ("The Strickland standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify.")

The first step in evaluating a claim for ineffective assistance of appellate counsel requires the court to examine the underlying allegations. <u>Moormann v. Ryan</u>, 628 F.3d 1102, 1106 (9th Cir 2010) (finding that the court must first "assess the merits of the underlying claims that trial counsel provided constitutionally deficient representation" before determining if Petitioner's appellate counsel provided ineffective assistance when he failed to raise issues regarding the effectiveness of petitioner's trial counsel's representation on appeal) (citing <u>Hain v. Gibson</u>, 287 F.3d 1224, 1231 (10th Cir. 2002) (to properly address a claim of ineffective assistance of appellate counsel, court must look to the merits of the omitted issue)).

Petitioner argues that trial counsel prevented him from testifying at trial and prevented him from notifying the trial judge that he wanted to testify. FAP at 23-28. A criminal defendant has a fundamental constitutional right to testify on his own behalf. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51 (1987). The right is personal to the defendant and the defendant's waiver of that right must be "knowing and intentional," but it need not be explicit. <u>United States v. Pino-Noriega</u>, 189 F.3d 1089, 1094 (9th Cir. 1999). In evaluating an implicit waiver, the Ninth Circuit has stated

> A defendant is presumed to assent to his attorney's tactical decision not to have him testify. The district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right. Waiver of the right to testify may be inferred from the defendant's failure to testify or notify the court of his desire to do so. A defendant who wants to reject his attorney's advice and take the stand may do so by insisting on testifying, speaking to the court, or discharging his lawyer. When a defendant remains silent in the face of his attorney's decision not to call him as a witness, he waives the right to testify.

<u>Id.</u> at 1094-95 (citations and quotations omitted).

Petitioner first raised this claim in a motion for a new trial. Lodgment 4 at 2042. During the hearing on the motion, the court heard testimony from both Petitioner and Petitioner's trial attorney, Mr. Rojo. <u>Id.</u> at 2045-2172. Both men were examined and cross-examined at length and then the court permitted counsel to argue the motion based upon the testimony. <u>Id.</u> at 2045-2187. At the conclusion of the hearing, the court found that Petitioner failed to establish that he "asserted a demand or desire to testify that was unequivocal." <u>Id.</u> at 2189. The court acknowledged that Petitioner may have wanted to testify and may have discussed that desire

with Mr. Rojo, but that the request(s) resulted in Mr. Rojo repeatedly explaining to Petitioner "what a bad idea it would have been for [Petitioner] to testify" and Petitioner acquiescing to that assessment.  Id.  The court reiterated that there was no evidence that Petitioner asserted an unequivocal desire to testify.  Id. at 2188-90; 2205 ("[Petitioner] was not precluded from testifying. I believe that, as Mr. Rojo pointed out, a decision was made all along that he was not going to testify.  And his statements to the contrary were not persuasive.").  The court also found that even if Petitioner had stated an unequivocal desire to testify, his testimony would not have resulted in a different outcome.  Id. at 2190-92.  The court explained that the case was not a close call and that there was overwhelming evidence that Mr. May intentionally assassinated the victim and that the reason for the murder was Petitioner's relationship with the victim.  Id. at 2191.  The court also stated that Petitioner's likely testimony "would not have served many [sic] of anything other than to possibly provide further impeachment of many of the witnesses who were impeached routinely."  Id.

A review of the record provides substantial support for the court's conclusions.  During the hearing, Mr. Rojo testified that he explained to Petitioner that Petitioner had rights that only he could decide and that Mr. Rojo could not waive for him, including the right to "plead guilty or not to plead guilty" and "not to incriminate himself or to testify on his behalf."  Id. at 2051.  Mr. Rojo testified that he discussed with Petitioner the possibility of Petitioner testifying but that Petitioner never demanded that he be permitted to testify or pressed the issue after it was discussed.  Id. at 2047-54.  Mr. Rojo stated that on the morning of the last day the defense put on evidence, Petitioner inquired as to whether or not he would testify.  Id. at 2049-2052.  Mr. Rojo explained to Petitioner why he thought Petitioner's testimony "was not advisable and not necessary either, and [Petitioner] acquiesced."  Id. at 2050.  Mr. Rojo noted that there was nothing contentious, hostile, or confrontational about the conversation.  Id. at 2053.  Mr. Rojo also testified that he and Petitioner had spoken previously about the possibility of Petitioner testifying and why he thought it would be a bad idea.  Id. at 2048, 2082-2083.  Mr. Rojo further testified that had he felt Petitioner was demanding to testify, he would have discussed the issue with Petitioner and permitted him to testify knowing that he would be doing so against the

advice of counsel.  Id. at 2074, 2083-84, 2088.

Mr. Rojo also provided specific reasons for his decision to advise Petitioner against testifying on his own behalf.  Id. at 2077-2083.  First, Mr. Rojo was concerned about taped jailhouse conversations which Petitioner had with Mr. May and which potentially could be used to impeach Petitioner.  Id. at 2077.  Second, Mr. Rojo joined Petitioner's case with Defendant May's case knowing that Defendant May's statement in which he exonerated Petitioner would be played.  Id. at 2078.  In addition, Mr. Rojo was concerned that if Petitioner testified, his alleged motive for committing the murder (being dumped by Ms. Winchell for the victim), would become clear and his credibility would suffer.  Id. at 2080.  Next, Mr. Rojo was concerned that Petitioner could be impeached by his admission that Mr. May may have had a gun, the fact that Petitioner knew the victim lived in an apartment complex near Petitioner and that he was furious that the victim came to California with Ms. Winchell, and Petitioner's statement to the police that Defendant May did not know the victim.  Id. at 2080-81.  Finally, Mr. Rojo testified that he did not believe that Petitioner's testimony would add anything to the case.  Id. at 2082 (Mr. Rojo "thought that Petitioner would be impeached in cross-examination by the prosecutor" and that the jail conversation would be used against Petitioner because "there was an awkward silence after Mr. May made statements that would incriminate [Petitioner and Petitioner] paused and remained silent.").

There are ample facts supporting the trial judge's conclusion that Mr. Rojo properly explained to Petitioner his right to testify and that Petitioner never unequivocally stated that he wanted to testify.  Moreover, given the facts and circumstances of this case, Mr. Rojo's recommendation that Petitioner not testify was not unreasonable and cannot be said to be deficient.  Although Petitioner testified that he was never told by Mr. Rojo that it was his decision to testify on his own behalf and that Mr. Rojo told him that he would "put [Petitioner] on last", the trial court did not find the testimony to be convincing.  Id. at 2188-2192.  The court noted that Mr. Rojo vigorously advocated for Petitioner throughout the trial and there was nothing to indicate that he would not have filed a motion to reopen the case to allow Petitioner to testify on his behalf, even against his own advice, if Petitioner had so demanded.  Id. at 2188.  Mr. Rojo

1  himself testified that this was be true. Id. at 2088. The court's factual determination is entitled

2  to deference. 28 U.S.C. § 2254(e); Miller-El, 537 U.S. at 340.

3      Because Mr. Rojo did not deny Petitioner his constitutional right to testify on his own

4  behalf, Petitioner's claim that his appellate attorney was ineffective for failing to raise that issue

5  also must fail. McGee, 2010 WL 2044526 at * 11 (stating that "[a]ppellate counsel's failure to

6  raise an issue on direct appeal cannot constitute ineffective assistance when the appeal would

7  not have provided grounds for reversal"). Appellate counsel is not ineffective for failing to raise

8  weak claims. Bailey v. Newland, 263 F.3d 1022, 1028-1029 (9th Cir. 2001).[13] Finally, as

9  previously noted, "the question [on federal habeas review] is not whether counsel's actions were

10  reasonable, [but] whether there is any reasonable argument that counsel satisfied Strickland's

11  deferential standard." Richter, 131 S.Ct. at 788 ("the standards created by Strickland and

12  § 2254(d) are both 'highly deferential' … and when the two apply in tandem, review is 'doubly'

13  so"). For the reasons set forth above, this Court finds there were ample facts supporting the

14  state court's decision and the denial of petitioner's claim was not objectively unreasonable. The

15  Court therefore **RECOMMENDS** that Petitioner's claim for ineffective assistance of counsel be

16  **DENIED**.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24

25      [13](quoting Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989) (We have stated, in applying Strickland to

26  a claim of ineffective assistance of appellate counsel, that "[t]hese two prongs partially overlap when evaluating the
   performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees

27  little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one
   of the hallmarks of effective appellate advocacy.… Appellate counsel will therefore frequently remain above an

28  objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same
   reason-because she declined to raise a weak issue.")).

13cv1598-BTM (BLM)

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than <u>**August 1, 2014**</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**August 22, 2014**</u>.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.


DATED:  July 17, 2014

BARBARA L. MAJOR
United States Magistrate Judge

13cv1598-BTM (BLM)